INDIANA CAL–PRO, INC., Petitioner, Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.

Nos. 88–5101, 88–5201.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 12, 1988.

Decided Dec. 22, 1988.

Charles Hampton White argued, Cornelius & Collins, Nashville, Tenn., for petitioner, cross-respondent.

Aileen A. Armstrong, Dep. Asso. Gen. Counsel, Linda Dreeben, Karen L. Arndt argued, N.L.R.B., Office of the General Counsel, Washington, D.C., William T. Little, Regional Director, N.L.R.B., Indianapolis, Ind., for respondent, cross-petitioner.

Before KEITH, JONES and MILBURN, Circuit Judges.

MILBURN, Circuit Judge.

Petitioner, Cross–Respondent Indiana Cal–Pro, Inc. ("the Company") petitions this court to review and set aside an order of the National Labor Relations Board ("the Board") finding the Company in violation of sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("the Act"). The Board has filed a cross-application for enforcement of its order. The Board's decision and order are reported at 287 NLRB No. 81. For the reasons that follow, we deny the Company's petition to set aside and grant enforcement of the Board's order.

## I.

### A.

On August 13, 1986, the Laborers' Local Union No. 741 ("the Union"), which is affiliated with the Laborers' International Union of North America, AFL–CIO, filed an unfair labor practice charge against the Company, alleging that the Company violated the Act by engaging in a concerted effort to coerce unit employees to abandon union support within the Company. The Union alleged that the Company interrogated employees as to their union sentiment, threatened closure of the plant should unionization occur, and prepared and circulated a petition disavowing union support.

On October 9, 1986, the Board issued an unfair labor practice complaint against the Company, alleging that the Union, as of June 17, 1986, represented a majority of the Company's employees (as established through Union authorization cards), that the Company had engaged in numerous acts interfering with and coercing its employees, and that the Company's conduct precluded the holding of a fair election among the employees. After a hearing before an Administrative Law Judge

("ALJ"), the Company was found to have violated sections 8(a)(1) and (5) of the Act as alleged by the Union.

On December 16, 1987, the Board rendered its decision and order affirming the ALJ's decision and adopting the recommended order of the ALJ with slight modifications. The Board ordered that the Company cease and desist from further unfair labor practices, post an appropriate notice of the Board's decision and order, and recognize and bargain collectively with the Union. The Company filed its petition to set aside the Board's order on January 26, 1988, and the Board cross-applied for enforcement on February 22, 1988.

### B.

The Company operates a limestone mine and processing facility in Ellettsville, Indiana. In 1978, the Company's production and maintenance employees were jointly represented by the Laborers' Local Union No. 741 and a local of the Operating Engineers' International Union. In 1984, the Company filed a decertification petition, but the two unions disclaimed interest in representing the employees, and, accordingly, the Company's production and maintenance employees went unrepresented.

In June 1986, John Siniard, a mine employee, initiated efforts to organize the employees. On June 15, 1986, Siniard obtained blank Union authorization cards from the Union, which he then distributed to other Company employees. Siniard told the employees that the cards were intended "to bring the Union back." Of the fourteen employees in the unit of production and maintenance employees, nine signed authorization cards by June 17, 1986. The cards stated:

I, the undersigned, hereby designate [the Union] as my collective bargaining representative in all matters pertaining to labor conditions, wages and hours of employment, and ... I do hereby apply for membership in [the Union] ... and agree to abide by all the provisions of the Constitution and By-Laws of [the Union].

J.A. at 307–16.

Siniard testified that on June 20, 1986, the signed authorization cards were returned to the Union. On July 8, 1986, the Union demanded recognition and filed a petition with the Board seeking a Board-conducted election. The Company refused recognition, and an election was scheduled but later canceled in light of the developments described below.

Several unit employees testified before the ALJ regarding events at the Company during June and July 1986. Garry Shrum, an employee who signed one of the authorization cards, indicated that approximately one week before July 28, 1986, he was in the Company's shop with Lester Christy, mine foreman, when Steve Summit, the plant superintendent, approached him. Shrum stated that Summit told the two of them that "you guys might think about looking for another job."

He said that he had received a letter from Mr. Summers [the Company president located in Nashville] that if the union come in [sic] that they was going to close the doors down, that they had offered him [*i.e.,* Summit] a job down south and had told him that he should talk it over with his family and see how they all felt about moving down south.

J.A. at 97.

Shrum testified that on other occasions Summit told him that Summers was upset about the employees' efforts to bring the Union back and that Summers had told Summit, "Well, if the union come back [sic], we'll just close the doors down," or "okay, fine, let them bring the union back in, but we'll be closing the doors down if they do." J.A. at 99, 100. Shrum told other unit employees of Summit's comments. Fearing unemployment, Shrum later obtained other work in Bloomington, Indiana.

Another employee testifying before the ALJ was Warren Walls. Walls, who also signed a Union authorization card, testified that he was on sick leave from about June 25, 1986, to July 20, 1986. He indicated,

however, that he visited the Company during the first week of July 1986, and at that time he entered into a conversation with Summit. He stated that he told Summit "things are looking a little slow around here," and Summit responded that although things were slow at present, "I know one thing for sure, if that union gets in, the company will close the doors." J.A. at 164. Walls also testified that during this visit to the Company he spoke with unit employees Siniard, Shrum, Richard Crowe, Gary Hoff, and John Sheppard and that each of these individuals told Walls that they had heard the Company would shut down if unionization occurred.

Herschel Sparks signed an authorization card and testified before the ALJ. Sparks stated that he was injured and unable to work from June 8, 1986, to August 6, 1986, but that on returning to work, he went into the office to punch in and ran into Summit. He testified that Summit asked, "if I had a job.... [T]hat if the union got back in they was going to close the doors down." J.A. at 185. He testified that Summit made similar remarks to him three or four different times during that week.

Although Summit denied making each of the statements related above, the ALJ chose to credit Shrum, Walls, and Sparks and discredit Summit. The ALJ noted that Shrum, Walls, and Sparks appeared to be forthright while Summit did not impress the ALJ "as a particularly credible witness[]." J.A. at 6.

According to Siniard, in late July he was approached by employee Roger Kemp about his efforts to bring the Union back. Kemp, who had earlier signed a Union authorization card, told Siniard "I think we screwed up." When Siniard asked why he thought so, Kemp responded "[t]hat if we brought the union back in, they would shut the doors." J.A. at 126. Kemp requested Siniard call the Union and ask it "to back off." J.A. at 127. Siniard testified he told Kemp he would call the Union.

Some time after this exchange, plant superintendent Summit called Siniard into his office and in Kemp's presence questioned Siniard regarding whether the Union had been called and asked to discontinue its unionization efforts. Siniard informed Summit that he had not yet called the Union, and Summit asked whether Siniard still intended to place the call. Siniard told Summit that he would call the Union. Although Summit denied having this conversation with Siniard, the ALJ chose to credit Siniard's testimony.

Later that same day, John Sheppard, an employee at the mine, asked Summit to assist him in drafting a petition disavowing Union support. Sheppard testified that he asked Summit to help him with "the wording and the spelling" of the petition. Summit then wrote the document which stated:

This is a petition to discontinue the representation of the Labors [sic] Union Local 741 of Bloomington.

J.A. at 306.

Sheppard testified that after Summit wrote the petition, Sheppard carried it, followed by Summit, to the employee lunchroom where he placed the petition on a table. Summit and Sheppard then stood in the lunchroom and watched while several employees read and signed the petition. Walls testified that when he first saw the petition, he asked Summit about the petition. Walls testified that "[h]e said I didn't have to sign it if I didn't want to, it was up to you. Whoever wanted to sign it could and who didn't want to didn't have to." Walls, however, related that he signed it because "I figured if I didn't sign it it would spoil me as being one of the union members...." J.A. at 168.

Siniard also testified that Summit was present in the lunchroom when he first saw the petition. Siniard signed the petition "[b]ecause if I hadn't signed it, he would have knowed [sic] who signed the union cards." J.A. at 131. Eventually, twelve employees signed the petition, including seven of the nine employees who signed Union authorization cards.

Kemp testified that on the day the petition was circulated, he was in the Company's office when Summit asked him whether he wanted to be represented by the Union. Kemp indicated that he did not, and Summit then asked him whether he

would sign a petition to that effect. Kemp replied that he would and signed the petition. Kemp further testified that Siniard was present at that time and that Summit again asked Siniard whether he had called the Union to tell them that the employees were no longer interested in Union representation. Kemp testified that Siniard stated he had not yet called but would do so.

Summit testified that on August 1, 1986, he telephoned Company President Summers regarding the petition to discontinue Union representation. Summers asked Summit who wrote the petition and when Summit told Summers that he had written it, Summers told him that the petition was ineffective if written by a Company official. Consequently, foreman Christy asked several employees in the lunchroom whether one of them would rewrite the petition. Siniard, who was present when Christy made this request (as was Walls), told Christy that he did not intend to either write or sign another petition.

Siniard later telephoned Union business agent Hardy and told him that the employees wanted the Union to "back off." Siniard explained that Summit had presented the employees with a petition disavowing union support which several employees had signed. Hardy told Siniard that the Union would file an unfair labor practice charge because Hardy felt the Company's activity in this regard was unlawful.

On August 8, 1986, Company President Summers sent a letter to the Regional Office for the Board, enclosing the petition to discontinue representation by the Union. Summers also sent the petition to a Union representative requesting that the Union advise the Company as to its intentions regarding representation of unit employees at the Company. Although Siniard and Walls testified that when they signed the petition Summit's signature appeared on the petition, the copies of the petition sent to the Board's Regional Office and Union representative appeared to be torn across the top and Summit's signature did not appear on those copies.

### C.

The Board, adopting the findings of the ALJ, concluded that the Company violated sections 8(a)(1) and (5) of the Act by coercively interrogating Kemp and Siniard about whether they desired Union representation and questioning Kemp about whether he would sign a petition disavowing Union support, by threatening various employees with plant closure in the event of unionization, by participating in the preparation and dissemination of a petition disavowing Union support and soliciting employees to sign the petition or to prepare another, and by refusing to recognize and bargain with the Union.[1]

The Board ordered the Company to cease and desist from these unfair labor practices and from in any other way interfering with, restraining, or coercing employees in the exercise of their rights under section 7 of the Act. Moreover, the Board entered a bargaining order against the Company. The ALJ, in recommending such an order, noted:

I conclude that ... considerations mandate a bargaining order in the instant case. The two management officials responsible for the day-to-day operation of the Ellettsville facility made widely disseminated and repeated threats to the employees in a small bargaining unit that the Respondent would close the facility if the Union became the employees' collective-bargaining representative, interroga-

---

1. Section 8(a)(1) of the Act states that it is "an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7]...." 29 U.S.C. § 158(a)(1). Section 7 provides in pertinent part:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....

29 U.S.C. § 157.

In section 8(a)(5), the Act states: "it shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees...." 29 U.S.C. § 158(a)(5).

ted employees about their feelings toward the Union, and the plant superintendent drafted a petition for the employees to sign disavowing support for the Union, signed that petition himself, solicited an employee to sign it, and stood nearby while other employees signed. Further, the member of management who was second-in-command, after learning that that petition was invalid, solicited employees to draft another. In these circumstances, I find that it is unlikely that a fair and free election could ever be conducted, and I therefore conclude that the best way to effectuate the employees' choice, as indicated by their signing of union authorization cards, is to order the Respondent to bargain with the Union.... I shall recommend that the Respondent be ordered to bargain....

J.A. at 18–19.

On appeal the Company raises essentially three issues: (1) whether the Board's finding that a Company official threatened plant closure should unionization occur is supported by substantial evidence, (2) whether the Board's finding that the Company prepared and circulated a petition disavowing union support is supported by substantial evidence, and (3) whether the Board erred in entering an order requiring the Company to recognize and collectively bargain with the Union.

## II.

### A.

■ The Company argues, among other things, that the factual findings reached by the Board are not supported by the record. Our standard of review over Board findings is well established: Where there is substantial evidence on the record as a whole to support the Board's conclusions, they may not be disturbed by this court. 29 U.S.C. § 160(e); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). Moreover, "it is the Board's function to resolve questions of fact and credibility." *NLRB v. Baja's Place*, 733 F.2d 416, 421 (6th Cir.1984). "[T]hus this court ordinari-

ly will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor." *Roadway Express, Inc. v. NLRB*, 831 F.2d 1285, 1289 (6th Cir.1987).

"The Board's application of the law to the facts is also reviewed under the substantial evidence standard, and the Board's reasonable inferences may not be displaced on review." *NLRB v. United States Postal Serv.*, 841 F.2d 141, 144 (6th Cir.1988) (citing *NLRB v. United Ins. Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968)); *see also Roadway Express, Inc.*, 831 F.2d at 1289 ("Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision."); *Universal Camera Corp.*, 340 U.S. at 477, 71 S.Ct. at 459.

The Company asserts that the Board erred in finding a violation of section 8(a)(1) by concluding that plant superintendent Summit threatened Shrum, Walls, and Sparks with plant closure if the Union won an election at the Company. The Board reached this conclusion by discrediting the testimony of Summit denying such statements were ever made. The ALJ explicitly based her credibility resolutions upon witness demeanor. As this court has stated, demeanor-based credibility determinations are entitled to considerable weight. *Krispy Kreme Doughnut Corp. v. NLRB*, 732 F.2d 1288, 1290 (6th Cir.1984). Here, the ALJ's resolution of the discrepancies in the testimony is reasonable and amply supported by the record. The Company fails to cite either inherently inconsistent statements by the employees credited by the ALJ or overwhelming evidence supporting an opposite conclusion. As a result, we hold substantial evidence supports this factual finding of the ALJ.

■ The Company also argues that even if the alleged statements were made, such statements were only fair predictions of natural, although adverse, consequences of unionization and not mere unsupported threats. The Company, relying on *NLRB v. Village IX, Inc.*, 723 F.2d 1360 (7th Cir.1983), maintains that it has a right un-

der section 8(c)[2] of the Act to state its side of the unionization issue irrespective of its stance toward the Union provided it does not unfairly attempt to coerce the employees. In *Village IX, Inc.*, the Seventh Circuit held that "it is apparent from section 8(c) ... that the company has a right to state its side of the case." *Id.* at 1367.

It is clear that under section 8(c) an employer is free to "predict[ ] ... the precise effects [it] believes unionization will have on [the] company." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). It is equally clear, however, that statements regarding the effects of unionization are not protected by section 8(c)'s free speech clause if "their reasonable tendency is coercive in effect...." *Peabody Coal Co. v. NLRB*, 725 F.2d 357, 363 (6th Cir.1984) (quoting *Henry I. Siegel v. NLRB*, 417 F.2d 1206, 1214 (6th Cir.1969), *cert. denied*, 398 U.S. 959, 90 S.Ct. 2175, 26 L.Ed.2d 545 (1970)).

In *Peabody Coal*, a superintendent at one of Peabody's mines expressed his "opinion" to a small circle of employees during an organization drive that a union victory would cause a shutdown at the plant. We concluded that even though the individual labeled his statement as only his opinion, that in the heat of a unionization effort, the statement could easily and understandably be perceived by employees as a veiled threat of retaliation. *Peabody Coal*, 725 F.2d at 363. We relied in part on the failure of the company to produce any "factual underpinning" for its prediction that a plant closure would result from a union victory. *Id.*

The importance of objective factors supporting employer predictions of the effects of unionization was initially stressed by the Supreme Court in *Gissel*. There the Court held that "an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union...." *Gis-*

*sel*, 395 U.S. at 618, 89 S.Ct. at 1942. The Court, however, stated that predictions regarding the effects of unionization must be factually supported:

> [Any] prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization.

*Gissel*, 395 U.S. at 618, 89 S.Ct. at 1942. *See also NLRB v. Okun Bros. Shoe Store, Inc.*, 825 F.2d 102, 107 (6th Cir.1987) ("Only where the threats or opinions refer to matters over which the speaker has no control may employees not reasonably conclude that they are being coerced."), *cert. denied*, —— U.S. ——, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988). Thus, the Court emphasized that, "[i]f there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion...." *Gissel*, 395 U.S. at 618, 89 S.Ct. at 1942. *See also NLRB v. Price's Pic–Pac Supermarkets, Inc.*, 707 F.2d 236, 240 (6th Cir.1983) (Statements regarding plant closure were found coercive threats where the company had "no clear idea of what the union's demands would be" and "failed to present ... the financial records relied upon in making the statements in question.").

Although the Company argues that *NLRB v. Village IX, Inc., supra*, supports its position, we find its reliance on that case misplaced as the company in *Village IX* provided "objective support for [its] prediction of the consequences of unionizing...." *Village IX, Inc.*, 723 F.2d at 1368. In the present case, no objective evidence was presented by the Company supporting a statement that unionization

---

**2.** Section 8(c) provides:

The expressing of any views, argument or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an un- fair labor practice under any of the provisions of this subchapter, if *such expression contains no threat of reprisal or force or promise of benefit.*

29 U.S.C. § 158(c) (emphasis supplied).

would result or even could result in an objectively required economic closing of the plant. Indeed, the Company failed before both the ALJ and the Board to support such a statement as based in fact.

In reviewing Company statements made in the emotion of a union drive, the Board reasonably considers the effect of the remarks from the point of view of those whose livelihood may depend on them. Thus,

> [w]hether or not a statement or series of statements has a coercive or threatening effect is an assessment which must be made "in the context of its labor relation setting," taking into account "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear."

*Peabody Coal,* 725 F.2d at 363 (quoting *NLRB v. Gissel Packing Co.,* 395 U.S. at 617, 89 S.Ct. at 1942). *See also NLRB v. E.I. DuPont De Nemours,* 750 F.2d 524, 528 (6th Cir.1984) ("In determining whether a statement is a coercive threat, the Board considers the 'total context' of the situation and 'is justified in determining the question ... from the standpoint of employees over whom the employer has a measure of economic power.'") (quoting *Henry I. Siegel Co.,* 417 F.2d at 1214); *Okun Bros. Shoe Store,* 825 F.2d at 107.

In our view, the Board's conclusion that Summit's statements had a tendency to coerce is supported by substantial evidence. Again, we note that "the actual effect of a statement is not so important as is its tendency to coerce." *Okun Bros. Shoe Store,* 825 F.2d at 107. Accordingly, the Company's petition to set aside this finding of the Board is denied.

**B.**

■ The Company also maintains that the Board erred in concluding that manage-

ment's participation in the process of preparing and circulating an anti-union petition violated section 8(a)(1) of the Act. In our view, however, the findings and conclusions of the Board in this regard are well supported by the record.

"It is a violation of Section 8(a)(1) of the Act for an employer to sponsor and participate in the circulation of a petition among employees withdrawing support from a union." *NLRB v. Allen's IGA Foodliner,* 651 F.2d 438, 440 (6th Cir.1981). *See also NLRB v. Priced–Less Discount Foods, Inc.,* 405 F.2d 67, 69 (6th Cir.1968) (where a bargaining order was upheld because the company assisted in the preparation and mailing of letters withdrawing Union support). An employer's participation in such a petition violates section 8(a)(1) because it "tends to be coercive or tends to interfere with the employees' exercise of their rights." *Okun Bros. Shoe Store,* 825 F.2d at 105.

The Company in this case states that since plant superintendent Summit performed only the ministerial task of drafting the petition for employee Sheppard, its participation in preparing the petition should not be considered coercive. We hold, however, that the Board's finding that the Company's involvement in the preparation and circulation of the petition rose to a coercive level is proper given the evidence in this case. The fact that the idea for the petition originated with a mine employee rather than with the Company is not conclusive as to whether the Company's participation in drafting and circulating the petition is coercive.

Here, the petition itself was written by Summit, Summit was present when several of the employees signed the petition, and Summit's name appeared at the top of the petition.[3] The unit employees, therefore, understandably considered the petition as sponsored and encouraged by the Company. Illustrative is the testimony of both Walls and Siniard to the effect that Sum-

---

**3.** Whether Summit's name, in fact, appeared on the petition was the subject of conflicting testimony; however, the ALJ found, based on the testimony of Siniard and Walls to this effect, that the petition was in fact signed by Summit, and we conclude this finding is supported by substantial evidence.

mit's mere presence in the lunchroom when the petition was presented created an atmosphere wherein Walls and Siniard felt they must sign the petition or be branded as Union sympathizers. Accordingly, the Company's petition to set aside this finding of the Board is denied.

### C.

■ As stated, the Board ordered the Company to bargain collectively with the Union. It is well settled that an employer may be ordered to recognize and bargain with a union which has established majority status through authorization cards among employees in an appropriate unit where the employer, through serious unfair labor practices, has dissipated a union majority in a manner precluding the holding of fair and free elections in the future. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 597–600, 89 S.Ct. 1918, 1931–1933, 23 L.Ed.2d 547 (1969); *Automated Business Sys. v. NLRB*, 497 F.2d 262, 270 (6th Cir. 1974). The issue before us in the present case is whether the Board abused its discretion in imposing a bargaining order as a remedy for violations of sections 8(a)(1) and (5) on the facts of this case.

Under *Gissel,* the Board, as a matter of discretion, has authority to enter a bargaining order on the basis of union majority status established through authorization cards. Because such remedial relief is discretionary, the scope of review varies from the review over factual conclusions:

> It is for the Board and not the courts … to make [the determination of what remedy is appropriate] based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of … the Act the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts.… "[I]t is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency."

*Gissel Packing,* 395 U.S. at 612 n. 32, 89 S.Ct. at 1939 n. 32 (quoting *Consolo v. FMC,* 383 U.S. 607, 621, 86 S.Ct. 1018, 1027, 16 L.Ed.2d 131 (1966)) (citations omitted); *see also Automated Business Sys.,* 497 F.2d at 272. We note, however, that "the Board's determination is not immune from review … [and] we must look at the circumstances surrounding the issuance of the bargaining order." *Automated Business Sys.,* 497 F.2d at 272; *see also NLRB v. Rexair, Inc.,* 646 F.2d 249, 250 (6th Cir. 1981).

■ We have held that a bargaining order is proper as a remedy for section 8(a)(1) violations where essentially three conditions occur:

1. The Union in fact has obtained authorization cards from a majority of employees in an appropriate bargaining unit without misrepresentations or other unfair practices on its part and has requested bargaining;

2. The employer has dissipated significantly the Union's majority by the commission of section 8(a)(1) violations; and

3. A fair election cannot be had under all the circumstances of the particular case.

*Priced–Less Discount,* 405 F.2d at 69–70. *See also Automated Business Sys.,* 497 F.2d at 268 (holding a bargaining order is appropriate where at one point the union had a majority but employer misconduct undermined majority strength and impeded the election process). We have also, however, indicated that a bargaining order should not be routinely entered and will not be upheld when

> '[t]he Board made no findings or detailed analysis as to the residual impact …, or to the likelihood of recurrence, of any of the unfair labor practices,' or when they are 'based on conclusory statements unsupported by sufficient facts,' … or when the Board's reasoning consisted simply of 'a litany, reciting conclusions by rote without factual explication.…'

*Rexair, Inc.,* 646 F.2d at 251. *See also Donn Prods., Inc. v. NLRB,* 613 F.2d 162, 166 (6th Cir.), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980)

("While we are required to respect the special expertise of the Board, particularly in the formulation of remedies, courts are not required to enforce bargaining orders based on conclusory statements unsupported by sufficient facts.").

In *Rexair,* we declined to enforce a bargaining order, noting that the Board "failed to support its conclusion that a bargaining order is the only satisfactory remedy in the present case." *Id.* at 251. We noted that the Board did not conduct any " 'analysis of the causal connection between the unfair labor practices and the conclusion that the election process was undermined' to the point that a bargaining order must issue." *Id.* (quoting *Automated Business Sys.,* 497 F.2d at 275). We have also expressed hesitancy to enforce a bargaining order where the union's majority status is established through authorization cards, given the "notorious unreliability" of the cards as demonstrative of union support. *See Priced–Less Discount,* 405 F.2d at 71. *See also United Servs. for the Handicapped v. NLRB,* 678 F.2d 661, 664 (6th Cir.1982) (per curiam) ("An election is the preferred method of determining the choice by employees of a collective bargaining representative.").

Although the Company urges that *Rexair* requires a reversal of the Board's order in the present case, we disagree. *Rexair* did not, and indeed could not, alter the "general test" for the entry of a bargaining order articulated by the Supreme Court in *Gissel. See Southern Moldings, Inc. v. NLRB,* 728 F.2d 805, 806 (6th Cir.1984) (en banc). In *Gissel,* the Court referred to the necessary findings "only in general language," *id.* at 806 n. 1, as follows:

> In fashioning a remedy in the exercise of its discretion ... the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment

once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue.

*Gissel,* 395 U.S. at 614–15, 89 S.Ct. at 1940.

In the present case, the Board complied with *Gissel* and did more than simply recite the unfair labor practices which it found the employer to have committed in determining that bargaining should be ordered. The Board here relied on the relatively small size of the bargaining unit, the level of management involved, and the extensive and egregious unfair labor practices committed by the Company. Particularly severe and pervasive were the repeated threats of plant closure which the Board found would have lingering effects that could not be readily dispelled.

Courts have repeatedly held that in view of an employee's natural interest in continued employment, threats of plant closure are "among the most flagrant" of unfair labor practices. *See Gissel,* 395 U.S. at 611 n. 31, 89 S.Ct. at 1938 n. 31; *NLRB v. Naum Bros., Inc.,* 637 F.2d 589, 592 (6th Cir.1981); *Donn Prods.,* 613 F.2d at 166 ("We recognize that a threat of economic retaliation by closing a plant is one of the most coercive actions which a company can take...."); *Piggly Wiggly, Tuscaloosa Div. Commodores Point Terminal Corp. v. NLRB,* 705 F.2d 1537, 1542 (11th Cir. 1983) ("[I]t is well established that threats of plant closures, by themselves, can justify a *Gissel* order."); *Electrical Prods. Div. of Midland–Ross Corp. v. NLRB,* 617 F.2d 977, 987 (3d Cir.) ("[A] closing is the penultimate threat for an employee, and its psychological effect is at least as likely not to dissipate as other unfair labor practices we have held to justify a *Gissel* ... order."), *cert. denied,* 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980); *Amalgamated Clothing Workers of America v. NLRB,* 527 F.2d 803, 807 (D.C.Cir.1975) ("[A] threat of plant closing is one of the most serious obstacles to fair elections ... [and] is sufficient to support a bargaining order, as discussed in the *Gissel* case."), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976); *Chemvet Labs., Inc. v. NLRB,* 497 F.2d

445, 448 (8th Cir.1974) (holding threats of plant closure are "the most potent" instruments of employer interference). Of course, in the present case, the Board found other unfair labor practice beyond the threats of closure which heightened the coercive impact of the Company's conduct. The anti-union petition, interrogation of employee Siniard, and the questioning of employee Kemp about his Union sentiments all serve to further buttress the Board's conclusion that a bargaining order is the appropriate remedy for the unfair labor practices committed in the present case.

The Board's order is supported with "more than conclusory statements" and has "disclos[ed] the reasons which led to its imposition." *GES, Inc. v. NLRB*, 697 F.2d 157, 159 (6th Cir.1983). Given the totality of the circumstances present here and the normal deference that should be accorded to the Board's discretionary decisions regarding appropriate remedies, we hold the order should be enforced.

### III.

Accordingly, for the reasons stated, the Company's petition to set aside the order of the Board is DENIED, and the Board's petition for enforcement is GRANTED.