**M.P.C. PLATING, INC., Petitioner, Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross Petitioner.**

Nos. 89–5869, 89–6040.

United States Court of Appeals, Sixth Circuit.

Argued May 4, 1990.

Decided Sept. 4, 1990.

William L.S. Ross and Donald F. Woodcock (argued), Calfee, Halter & Griswold, Cleveland, Ohio, for M.P.C. Plating, Inc.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Robert F. Mace (argued), Charles P. Donnelly, Jr., William M. Bernstein, N.L.R.B., Office of the Gen. Counsel, Washington, D.C., and Frederick Calatrello, Director, N.L.R.B., Region 8, Cleveland, Ohio, for N.L.R.B.

Before KENNEDY and WELLFORD, Circuit Judges, and JOINER,* Senior District Judge.

WELLFORD, Circuit Judge.

Petitioner, M.P.C. Plating, Inc. ("MPC"), charged by the National Labor Relations Board with unfair labor practices, is a small metal plating business engaged in buffing, polishing, and plating metal parts. It is the wholly-owned corporation of its president, Albert Walcutt. His wife, Roseann, serves as MPC's secretary-treasurer and also acts as the company's bookkeeper. The Walcutts' son-in-law and plating foreman, David Piwarski, Benny Strozier, longtime foreman of the buffing department, and Joseph Roth, a chemical engineer, are the only three individuals employed at the supervisory level.

During the relevant period, MPC employed approximately thirty production and maintenance workers, of whom approximately fourteen or fifteen were permanently on MPC's payroll. The remaining employees were temporary employees, which MPC hired through Ger–Mar Temps, an employment agency owned by Geri Nigro and Marge Martens. Neither Nigro nor Martens have any other connection to MPC or to the Walcutts.

These temporary employees worked alongside the permanent MPC employees and performed similar work. MPC paid Ger–Mar $4.40 an hour for each temporary employee, a rate that covered the employee's minimum wages, unemployment compensation, and workmen's compensation coverage. Unlike MPC's permanent employees, the temporary employees received no fringe benefits. Permanent MPC employees earned between $3.75 and $4.50 an hour and received time-and-a-half for overtime work. The permanent employees also received a paid hospitalization policy, a life insurance plan, certain vacation days, and other fringe benefits, including participation in a profit-sharing program.

In June of 1985, Rashad Shareef, on permanent MPC employment rolls, distressed with what he perceived to be unhealthy and unsafe working conditions at the plant, began discussions about organizing a union. Prior to taking his vacation, Shareef asked Strozier, his foreman, for the name of the union which had previously represented the MPC workers. (This union had been decertified in 1982.) He also told Strozier that he planned to contact the union about orga-

---

* the Honorable Charles W. Joiner, Senior United States District Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

nizing. Shareef also told Violet Rostrum, another employee, about his desire to organize or to bring back the former union.

At the Board hearing, Shareef testified that at the beginning of the unionization efforts both Mr. and Mrs. Walcutt asked him to keep an eye on the employees because they were "acting strange." He also testified that Mrs. Walcutt questioned him about employee discontent and the prospect of the employees organizing a union; she asked him "to report to her" any of these activities. Shareef, however, divulged nothing to his employers. In July of 1985, while Shareef was on vacation, he met with Terry Freeman, a union agent, and together they planned a meeting for MPC employees during that month. Shareef informed Strozier that he had met with a union representative.

Upon returning to work after his vacation, Shareef was directed to Mr. Walcutt's office. Walcutt questioned Shareef about the workers' organizing a union. Although Shareef stated that he knew nothing of the organizing efforts, Walcutt told Shareef that he would shut down the plant, rather than allow his workers to unionize. Shareef also stated that later that same day, Mrs. Walcutt informed him that she knew that an organizing effort was underway. She requested that Shareef discover for her who was organizing the union campaign. She also stated that any employee behind the union effort would be fired. Shareef testified that he then called Strozier, who told him that Mrs. Walcutt had asked him (Strozier) to interrogate Frank Billip, another employee, regarding potential union activity. (Walcutt subsequently told Strozier not to bother because he knew that union organizing efforts had begun.)

Billip testified that Strozier did discuss with him the union organizing efforts. After admitting organizational efforts, Billip stated that Strozier then told him that "Al (Walcutt) already knew about it" and was "going to do something about it too." The Walcutts and Strozier denied making any of these statements attributed to them.

Everett Davis, an MPC employee, drafted a list of employee complaints in prepara-tion for the union meeting. Davis' supervisor, Piwarski, saw Davis with the list and inquired about its contents. Davis claimed that the list was personal, but Piwarski called him into an office and continued to question him about it. Davis subsequently allowed Piwarski to view the list after Piwarski allegedly told him he would not allow him to leave until Walcutt talked to him. Later, Davis was admonished to present his grievances to his supervisors, rather than writing them down. Before the union organizational meeting, Walcutt questioned Davis about the problems on the grievance list, stating that he would "correct" some of Davis' concerns, but he refused to accede to others.

About this same time, Davis was given a warning for allegedly violating company rules regarding the temperature of certain solutions used in the plating process. Davis noted that the temperature was below normal and so indicated on the lab report, but he neglected to advise his immediate supervisors. As a consequence, parts worth several thousand dollars were damaged. The other employee involved was subsequently discharged, and on July 17, Davis received a written warning for his part in the episode.

Davis attended the union organizational meeting and signed an authorization card. Davis also attempted to solicit other workers to sign authorization cards. Later that day, Mr. Walcutt allegedly became angry after overhearing Davis and another employee discuss the union in the restroom.

A few days later, Walcutt fired Davis. Davis questioned why he was terminated for an incident which had happened about a week earlier. Walcutt hold him that this incident had just come to his attention; he also told Davis that he had just learned that Davis had previously received two warnings for inattentive work. Davis claimed that he was fired instead for his union activities. MPC rules provided that an employee would be discharged when that employee had committed three violations, the second of which had to be in writing. Subsequently, however, an unemployment compensation referee determined

that Davis was discharged for good cause and that his discharge was in no way connected to his union activities.

Within a few days after the union organizational meeting, a majority of the production and maintenance workers at MPC had signed authorization cards authorizing Teamsters Local 507 to be their collective-bargaining representative. A union agent then promptly visited the MPC facility to request union recognition from MPC management. Walcutt talked to him through a window separating the reception area from the interior of the plant. An attempt to have Walcutt sign a letter recognizing the union was ignored. The union representative then left a letter on a nearby window ledge demanding recognition. Mr. Walcutt claimed that he did not receive such a letter. The union then mailed a certified letter to MPC demanding recognition and a bargaining meeting. MPC refused to accept delivery of the letter.

At about the same time, the Walcutts met with Ms. Nigro of Ger–Mar Temps and discussed the Walcutts' proposal to transfer all MPC permanent employees to Ger–Mar's payroll immediately. Under this proposal, MPC employees would be put on the payroll of Ger–Mar but would continue working at MPC, receiving weekly paychecks and workmen's and unemployment compensation through Ger–Mar. In consideration, MPC was to pay Ger–Mar a premium of twenty percent above each employee's hourly rate. While Ger–Mar did not provide medical insurance for its temporary employees, Ms. Nigro stated that she would look into the possibility for MPC, and the Walcutts assured her they would offset any costs associated with insurance coverage. MPC's profit-sharing plan was to be scrapped, and MPC employees would lose their life insurance policy and their bereavement leave.

Ms. Nigro prepared a letter of understanding which referred to meetings or contact between Ger–Mar and MPC which had allegedly taken place in November of 1984 and April of 1985, instead of July of 1985 when they had actually taken place.

Walcutt designed the proposal as if it had been formulated prior to any union activities. At the hearing, however, Nigro and Martens of Ger–Mar stated that they had never discussed the transfer of MPC employees to the Ger–Mar payroll prior to July 23. The only evidence of April 1985 discussions concerned a letter regarding whether Ger–Mar carried certain insurance. (There had also been discussions regarding temporary labor at the Walcutts' new plastics business, but not at MPC.)

Mr. Walcutt took the position that he wanted to transfer MPC's employees to Ger–Mar because of MPC's declining economic circumstances. MPC's accountant, Douglas Newcomb, had advised the Walcutts to rely more heavily on temporary labor as a cost saving measure, and during the week prior to the strike by MPC employees, there had been insufficient cash in their bank account to cover the MPC payroll. Mr. Walcutt testified that by July 22 he had determined that their immediate cash flow problem could be resolved only by transferring the employees to Ger–Mar. Walcutt met with his employees to inform them of the proposed transfer plan; Ger–Mar principals also attended this meeting. Walcutt told the employees that unless they transferred to Ger–Mar, they would not be allowed to work at MPC. Despite this admonition, only two MPC employees agreed to transfer.

On the next day, the Walcutts met again with Martens and Nigro and asked them to backdate to July 16 the July 23 letter of understanding. Mr. Walcutt also requested that Martens and Nigro prepare two additional letters regarding alleged discussions which had taken place earlier regarding the transfer plan. Walcutt wanted to pass the letters off as original letters. Although Martens and Nigro prepared a copy of the July 23 letter which they backdated to July 16, they never sent it to MPC. Mr. Walcutt later telephoned Ger–Mar and asked that they not carry through with the backdated letter scheme.

When Walcutt refused to allow employees who had not signed up to work on Ger–Mar's payroll to enter the plant, both

Ger–Mar and MPC employees initiated a strike, which lasted several months; consequently, most employees lost their jobs. MPC resumed production the following week, using Ger–Mar temporary employees, and then later MPC began using permanent employees again.

The Board, in agreement with the ALJ, found that (1) MPC had violated § 8(a)(1) of the Act by requesting Shareef to surveil employees, by threatening to close the plant down if the workers unionized, by interrogating Shareef about union activities, and by making statements to Billips giving him the impression that the union was under surveillance; (2) MPC violated §§ 8(a)(3) and (1) by firing Davis for his union activities [1] and by constructively discharging employees who refused to transfer to Ger–Mar's payroll; and (3) MPC engaged in unfair labor practices in violation of §§ 8(a)(5) and (1) of the Act. Unlike the ALJ, the Board found that because of the severity of unfair labor practices it would impose a bargaining order on the parties. The Board also issued a cease and desist order prohibiting MPC from interfering with the employees' rights under § 7 of the Act and ordered that MPC hire a permanent work force, offer reinstatement to four employees who had been discharged but who had not engaged in strike-related misconduct, and various other relief.

MPC argues that it was, in effect, a joint employer with Ger–Mar and that the transfer of its employees to Ger–Mar's payroll, with the employees receiving virtually the same benefits, did not constitute a discharge or constructive discharge within the meaning of the Act. [2] The ALJ found that MPC "effectively discharged" the employees who refused to transfer to Ger–Mar's payroll and therefore violated §§ 8(a)(3) and (1) of the Act, and found further that working *at* MPC while on Ger–Mar's payroll was not the same as working *for* MPC.

She further found that the employees would lose substantial benefits if required to transfer to Ger–Mar's payroll and that MPC's economic justification theory was not credible.

■■■ In reviewing the findings of fact, this court must accept the findings below if they are supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). After reviewing the record, we are satisfied that the ALJ's findings of fact are supported by substantial evidence, including the finding that MPC effectively discharged the employees by requiring them to transfer to Ger–Mar's payroll. *See P.E. Van Pelt, Inc.*, 238 NLRB 794 (1978), and *Grand Rapids Die Casting v. NLRB*, 831 F.2d 112, 117 (6th Cir.1987).

There are two types of constructive discharge cases. The first is the "classic" case where the working conditions are so intolerable that the employee is effectively discharged. The second involves a situation in which "an employer confronts an employee with the Hobson's choice of either continuing to work or foregoing the rights guaranteed him under Section 7 of the Act." *Remodeling by Oltmanns, Inc.*, 263 NLRB 1152 (1982), *enf'd*, 719 F.2d 1420 (8th Cir.1983). We find substantial evidence to support a finding that MPC constructively discharged it employees under this second theory or type of constructive discharge.

The employees were engaged in organizing a union, a right guaranteed under the Act at the time, and MPC was well aware of the employees' unionization efforts. In addition, there was strong evidence of the Walcutts' strong opposition to these efforts. Walcutt specifically informed the employees that if they did not transfer to Ger–Mar's payroll, they would not be allowed to work at MPC. Finally, Walcutt actually prohibited workers who had not

---

1. It appears that MPC has not challenged the Davis incident.

2. The Board argues that MPC has waived its joint employer argument because it did not file an exception to the ALJ's decision regarding such an argument. We agree and hold that

MPC has waived such an argument because it did not file an appropriate exception with the ALJ. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2082–83, 72 L.Ed.2d 398 (1982). Nonetheless, we will briefly address the argument.

agreed to transfer to Ger–Mar to enter the plant to work.

There may have been some economic justification for effecting the transfer plan, but we cannot find error in the ALJ's rejection of this defense under the totality of circumstances. There is a serious question, moreover, as to whether the transfer of employees to Ger–Mar would have solved MPC's cash flow problem. There is clear evidence that the MPC employees were engaged in a protected activity, and MPC violated §§ 8(a)(3) and (1) of the Act by constructively discharging its employees.

 MPC contends that it was not required to recognize and bargain with the union because the union did not follow the preferred method for establishing the bargaining relationship. It argues that the employees should have conducted a secret ballot election, rather than merely signing authorization cards to indicate the choice of the union representation. While an election is indeed the preferred method, it is not a mandatory requirement. An employer who fails to recognize and to bargain with a union supported by a majority of authorization cards may be subject to unfair labor practice charges.

 The Board, which reversed the ALJ and ordered that MPC bargain with the union absent any election, cited *Indiana Cal–Pro, Inc. v. NLRB,* 863 F.2d 1292 (6th Cir.1988), in support of the decision to issue the bargaining order. As the Board correctly noted, the election process is the preferred method; however, in extreme cases where the prospect of holding fair elections has been so diminished by the employer's persistent unfair labor practices, the Board may order the employer to bargain with the union based on the majority of employees' signing election cards and other indicia of strong majority union support. 863 F.2d at 1300.

 MPC contends that the passage of time from the alleged violations to the present (four years), the high turnover rate of employees (over 100%), and the union misconduct on the picket line all militate against the issuance of the bargaining order in the present case. MPC argues that it was error for the Board to reverse the ALJ's conclusion that no bargaining order should be issued because the Board failed to make detailed factual findings as required by *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In this circuit, there are three requirements which must be met before the Board may issue a bargaining order:

1. The Union in fact has obtained authorization cards from a majority of employees in an appropriate bargaining unit without misrepresentations or other unfair practices on its part and has requested bargaining;

2. The employer has dissipated significantly the Union's majority by the commission of section 8(a)(1) violations; and

3. A fair election cannot be had under all the circumstances of the particular case.

*Indiana Cal–Pro, Inc.,* 863 F.2d at 1300. *See also NLRB v. Priced–Less Discount Foods,* 405 F.2d 67 (6th Cir.1968). In reaching its determination to issue a bargaining order, the Board *must* make factual findings and *must* support its conclusion that there is a *causal* connection between the unfair labor practices and the probability that no fair election could be held. *Cal–Pro.* at 1300–01. This court will not enforce a bargaining order supported only by "conclusory statements." *Id.*

In this case, the ALJ, relying on the lapse of time and the high turnover rate among employees, found that she "would have to engage in rank speculation to assume that [MPC's] 1985 unfair labor practices had and [sic] enduring, coercive effect...." Therefore, she declined to issue a bargaining order. The Board rejected the ALJ's reasoning, reversed the ALJ, and issued a bargaining order. We believe to do so was erroneous under the circumstances.

 None of MPC's present employees worked for MPC during the unfair labor practices, and the severity of MPC's violations would not likely be known to the present employees. The bargaining order

was not warranted under the three requirements set out in *Cal–Pro*. There is missing from the Board's analysis consideration of the second element of the *Cal–Pro* test: whether MPC's unfair labor practices "ha[ve] dissipated significantly the union's majority...." There are no findings to support the third element of this test: that "a fair election cannot be had under all the circumstances," leaving the Board with no persuasive justification for the conclusion that a fair election could not have been had.

We accordingly AFFIRM the Board's determination and order in all respects except its direction that MPC bargain with the union concerned. The case is therefore REMANDED for such further orders and conditions, except for a bargaining order, that the Board may deem appropriate in light of the conclusion, supported by the evidence, that MPC was guilty of unfair labor practices.

KENNEDY, Circuit Judge, concurring.

I concur in the Court's opinion except in the sentence which states: "There is missing from the Board's analysis consideration of the second element of the *Cal–Pro*[1] test: whether MPC's unfair labor practices 'ha[ve] dissipated significantly the union's majority....'" (Footnote added.) There was really no dispute regarding this second element once MPC was found to have effectively discharged its employees and that it was guilty of the unfair labor practices alleged. As stated in the Court's opinion, most of the employees lost their jobs because of the employer's unfair labor practices. With almost all of the employees who signed authorization cards gone, the union obviously lost the majority of those who signed the cards. The second element of *Cal–Pro* must be measured as of the time the unfair labor practices occurred.