989 F.2d 500
 144 L.R.R.M. (BNA) 2056
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner Cross-Respondent,
v.
ELECTRO-WIRE TRUCK & INDUSTRIAL PRODUCTS GROUP, Respondent
Cross-Petitioner.
 Nos. 92-5209, 92-5228.
 United States Court of Appeals, Sixth Circuit.
 March 25, 1993.
 
 Before: KENNEDY and SUHRHEINRICH, Circuit Judges; and WELLFORD, Senior Circuit Judge.
 WELLFORD, Senior Circuit Judge.
 
 
 1
 Electro-Wire Truck & Industrial Products Group (Electro) makes wire harnesses in Kentucky and supplies a Ford Motor Company plant. The United Auto Workers (the union) began an organizational campaign in June of 1990, holding its first meeting on June 3. Approximately ten Electro employees attended that meeting and received union buttons and t-shirts.
 
 
 2
 The following day, most of these employees wore buttons or t-shirts to the Electro plant, two of whom were probationary employees, Peters and Wilson.[1] Peters began working on May 1 in the maintenance department as a "set up" employee and Wilson started on May 2 as a production line inspector in the quality control department. We consider the issues as to each employee separately.
 
 I. KENNETH PETERS
 
 3
 Early on June 4, Betty Jo Bolin, an Electro line supervisor, spoke with several employees about her experience with the union at a different plant. She explained that once the union comes into the plant, the wages would freeze until a contract was agreed upon. She also stated that "the company couldn't afford to be paying what they were paying--that the employees thought they would get a raise and they did not." Later, she told a different group of employees about her union experiences with another employer.
 
 
 4
 Employee, Dominique Glover, testified that Bolin told him and others that the union was no good and that it would not help them get a raise. He recounted, moreover, that Bolin stated "if the union was voted in at Electro Wire that supervision wouldn't go for it and that the plant would close." Glover also spoke with Gary Woody, a supervisor, on several different occasions. On one particular time, he asked Woody if management had sent him to find out what the employees wanted and he responded "Well, I ain't going to lie to you. Yeah."[2] Later in that conversation, Woody asked if the employees wanted to talk to someone in management about their respective concerns which they later did.[3]
 
 
 5
 Woody asked Peters if he attended the union meeting on June 3. Peters explained that he had not but would have if he could. After the questions, Woody walked back to the main office. Peters was present also when Bolin explained her personal experiences with the union. His testimony was similar to that of Glover. According to Peters, Bolin indicated that management would lock the doors and move the plant if the union was certified.
 
 
 6
 Earlier, Woody had encountered three employees in the bathroom, including Peters, and he told them that "from now on" they would be required to get a restroom pass from their supervisor before leaving the line.[4] Woody also told them in the restroom that this was the kind of thing they should have expected. The other employees involved corroborated Peters' account of the restroom incident.[5]
 
 
 7
 Later that afternoon, Peters complained about the new restroom pass system. Woody responded: "Well, it doesn't really matter what you like anyway, because today's your last day." Other employees asked about this response and Woody explained they did not need three set-up people.[6] Peters responded that he was fired because he wore the union button and Woody commented "You're probably right. You'd still have a job if you didn't put that button on." Woody denied making this remark. After Peters dismissal, Electro transferred employee Ellegood to a set-up position; this raised a question about whether there was a further need for three set up people.[7]
 
 II. MELISSA WILSON
 
 8
 Melissa Wilson was discharged on June 5. Electro argues that she was properly discharged for inadequate work, but the NLRB found it was in retaliation for wearing a union button on June 4.
 
 
 9
 Wilson attended the union meeting on June 3 where she obtained a union t-shirt and button. On June 4, Glenn Roberts, an Electro supervisor, approached Wilson to inquire as to why the employees were having a union drive. She responded that she could not talk about it on Electro's time.
 
 
 10
 The quality control inspectors, of which Wilson was one, were told by quality control technician Vicki Hall that they would need bathroom passes before leaving the floor. At no time before the union driver had quality inspectors been previously required to obtain such passes.
 
 
 11
 On June 5, quality control supervisor, Kathy Gardner, called Wilson to the lunch room where she read the employee-at-will statement out of the employee handbook to her in the presence of Bolin. Kathy Gardner inquired if Wilson understood this statement, to which she responded "yes." Wilson was asked to sign a voluntary leave form but she refused to do so. Electro allegedly never explained why Wilson was being fired.
 
 
 12
 Wilson denied having ever been disciplined or "written up" for poor work performance. Electro, on the other hand, claims she was disciplined on May 29 for poor work and presented evidence of a note by Kathy Gardner explaining she talked to Wilson about her poor work. At no time, did any supervisor fill out an Employee Disciplinary Report concerning Wilson's alleged poor work. Electro also claimed that Wilson was discharged because Ford Motor Company had returned a bad harness from Wilson's work station.
 
 
 13
 Electro claims that supervisor Gardner had received numerous reports that Wilson would not stay in her work station as well as a report that she was not checking the harnesses properly.
 
 III. THE ALJ'S DECISION
 
 14
 After hearing all of the evidence, the ALJ determined that in fact Electro did threaten the employees with lower wages, loss of seniority, and plant closure in violation of Section 8(a)(1) of the Act. Also, through its supervisors, Electro interrogated its employees concerning the union, thereby violating Section 8(a)(1) of the Act. Electro was found to have solicited grievances, a violation of the same section.
 
 
 15
 The ALJ determined that Wilson and Peters were "discharged because of their demonstrated union sympathies." The ALJ found that both Wilson and Peters were discharged not because of poor work, or lack of work, but because of their union sympathy. He, thus, concluded that Electro violated Section 8(a)(3) of the Act. Finally, the ALJ found that the sudden institution of the restroom pass policy was in retaliation for the union activity and thus, violated Section 8(a)(3) also.
 
 
 16
 A three board panel of the National Labor Relations Board (the Board) reviewed the objections by Electro and affirmed the ALJ's decision in all aspects. The Board noted that although Electro objected to the ALJ's credibility findings, the Board does not overrule credibility resolutions except by a clear preponderance of the evidence. See Standard Dry Wall Products, 91 NLRB 544, enf'd 188 F.2d 362 (3d Cir.1951). The Board found no basis for reversing the findings based upon its review of the record.
 
 IV. THIS COURT'S REVIEW
 
 17
 We review the Board's factual determinations to determine if they are supported by substantial evidence. Indiana Cal-Pro, Inc. v. NLRB, 863 F.2d 1292 (6th Cir.1988); NLRB v. State Planning & Finishing Co., 738 F.2d 733, 737 (6th Cir.1984); 29 U.S.C. § 160(e). This "court ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor." Indiana Cal-Pro, 863 F.2d at 1297 (citation omitted). The Board's inferences based upon factual findings will not ordinarily or readily be displaced. Id.
 
 A. Threats
 
 18
 Electro argues that the Board's decisions ignored its First Amendment rights and that the statements involved were neither threatening nor violative of Section 8(a). An employer is free to communicate with its employees in general terms about unions as long as the communications do not threaten or promise benefits. NLRB v. Gissel Packing Co., 395 U.S. 575, 618 (1969). The Supreme Court agreed that the "conveyance of the employer's belief, even though sincere, that unionization will or may result in the closing of the plant is not a statement of fact unless, which is most improbable, the eventuality of closing is capable of proof." Id. at 618-19 (citation omitted). The prediction of closing the plant was construed as a threat.
 
 
 19
 Electro argues that the statements and so-called threats were isolated episodes lacking coercive nature or pattern. The issue is close concerning the Bolin statements, which to some degree, were a sharing of her personal experiences with the union at another plant. We conclude, however, that there was substantial evidence to support the ALJ's conclusions in this respect. See Indiana Cal-Pro, 863 F.2d at 1297.
 
 B. Interrogation
 
 20
 This court must look to the totality of the circumstances to determine if interrogation about union activity tends to coerce or to interfere with the employee's protected rights. Dayton Typographic Serv., Inc. v. NLRB, 778 F.2d 1188, 1194-1195 (citing Rossmore House, 269 NLRB No. 198, enf'd sub nom 760 F.2d 1006 (9th Cir.1985)). In considering this issue, we look to any prior hostility by the employer to unionization, the position of the questioner in the employer's hierarchy, the nature of the information sought, and the place and methods of interrogation. Rossmore House, 269 NLRB at 1178. Our deference to the Board's factual and credibility determinations make us reluctant to reverse on this issue as to Peters. We find insufficient evidence, however, to support the interrogation charge as it pertains to Melissa Wilson.
 
 
 21
 We find substantial evidence to support the charge of solicitation of employee grievances. After inquiring what the employees wanted, Electro's supervisor suggested that the employees talk to the personnel manager about their questions and complaints. This action could well be deemed as an immediate reaction to the show of union support, a solicitation violating the Act.
 
 
 22
 We, accordingly, affirm both the interrogation charges (except as to Wilson) and the solicitation charges as violations.
 
 C. Discharge
 
 23
 Discharge of employees for union activities violates both Section 8(a)(1) and (3) of the Act. NLRB v. E.I. Dupont De Nemours, 750 F.2d 524, 528-29 (6th Cir.1984) (per curiam). Once the general counsel shows the union activity was a motivating factor, then the employer can show as an affirmative defense that the employee would have been discharged for legitimate reasons absent the employee's protected activity. NLRB v. Valley Plaza, Inc., 715 F.2d 237 (6th Cir.1983). The employer's motivation is subjective and, thus, the Board may rely on circumstantial evidence. E.I. Dupont, 750 F.2d at 529.
 
 
 24
 Electro insists that the second shift was eliminated on June 16 and, therefore, had Peters not been discharged on June 5, he would have been discharged about ten days later, in any event. There is insufficient evidence of lay offs or elimination of a second shift for this court to rule definitively on this question. The ALJ noted by footnote: "According to this record, no other employees were laid off as a result of the decision to terminate the entire second, or 'split,' shift." This cryptic finding does not fully address Electro's contention.
 
 
 25
 The record does reflect that overtime was required of the employees in the fall of 1990, but Peters was not called back to work. Electro claims that the second shift was eliminated in June, but the actual evidence concerning this contention is sparse. We affirm the Board's conclusion with respect to Peters, but require that the record be left open for a determination whether Peter' job would have been eliminated, in any event, within a few weeks. The decision on this issue is now premature; it should, however, be litigated in a subsequent compliance procedure to determine Peters' entitlement to back pay.[8]
 
 
 26
 Electro presented evidence that Melissa Wilson was discharged due to poor work performance. The ALJ found that other quality inspectors had several written warnings and had not been discharged. Wilson denies having been warned of poor work quality on May 29 and the document presented by Electro was not the typical disciplinary form.
 
 
 27
 There is substantial evidence that Wilson's union support was the motivating factor for her discharge. Our function is not to decide whether there may have been legitimate concerns about her performance. We affirm the Board on the Wilson discharge in deference to the credibility determinations involved.
 
 D. Restroom Policy
 
 28
 Imposition of more onerous working conditions during a union drive is suspect. NLRB v. La-Z-Boy Tennessee, 233 NLRB 1255, 1264 (1977), enf'd, 623 F.2d 20 (6th Cir.1980). In this case, two departments who had not been required to obtain bathroom passes before were required to do so starting June 4. (The NLRB was quick to point out that the restroom permission policy only lasted a couple of weeks.) Electro argues that restroom use had been abused and thus, they began enforcing a long established policy to curb abuse. The ALJ's findings that Electro violated the Act are supported by substantial evidence.
 
 V. CONCLUSION
 
 29
 In summary, we AFFIRM the Board in all respects except the interrogation charge as it relates to Wilson. We also require the record to be open for determination as to whether Peters would have been discharged a few weeks after the termination at issue for reasons essentially unrelated to union activity.
 
 
 
 [1]
 Probationary employees are those hired within the last ninety days; they must complete a ninety day period with satisfactory work to become regular employees. Once an employee completes the ninety day period he/she is eligible for benefits
 
 
 [2]
 The ALJ found that Woody was sent "to find out why the employees wanted a union and suggested that they present their grievances to higher management." Solicitation of grievances violated Section 8(a)(1) of the Act, according to the Board
 
 
 [3]
 The employees spoke with Personnel Manager "Tex" Harp about their concerns. That meeting occurred on June 5. In that meeting the employees testified that Harp denied eliminating the second shift
 
 
 [4]
 Maintenance employees were not required to get a restroom pass before June 4 as other departments were required to do so. The NLRB notes in their brief that the system was discontinued after several weeks
 
 
 [5]
 The ALJ found both employees to be credible since both were still employed with Electro at the time of giving testimony, and thus vulnerable to recrimination by Electro
 
 
 [6]
 Electro argues that had Peters not been discharged on June 4, then he would have been discharged on June 16 when it claimed that the second shift was eliminated
 
 
 [7]
 Electro argues that Ellegood was not reclassified until March of 1992, nearly two years after Peters' discharge. Gene Lay, another probationary employee hired after Peters, was also in the maintenance department but he was not discharged. A question of fact existed as to whether Electro followed seniority policy in discharging Peters. The ALJ found that it did not
 
 
 [8]
 To the extent any statements by the ALJ may appear to rule on this issue or to constitute findings with respect to it, we set them aside in order that the parties may proceed with a clean slate at the parties' later hearing