Richard L. **AHEARN**, Regional Director of the Ninth Region of the National Labor Relations Board, For and on Behalf of the **NATIONAL LABOR RELATIONS BOARD**, Petitioner,

v.

**AUDUBON REGIONAL MEDICAL CENTER, Respondent.**

No. C96–251–L(H).

United States District Court,
W.D. Kentucky,
Louisville Division.

Aug. 6, 1996.

Deborah Jacobson, National Labor Relations Board, Cincinnati, OH, for Petitioner.

Thomas J. Birchfield, Richard S. Cleary, Greenebaum Doll & McDonald, Louisville, KY, for Respondent.

## MEMORANDUM OPINION

HEYBURN, District Judge.

Before the Court is a petition for interim injunctive relief filed pursuant to Section 10(j) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(j).[1] Both parties have extensively briefed the substantive issues that exist in an underlying case pending before an administrative law judge. The Court commends counsel on their thorough briefing of these difficult issues.

Petitioner requests interim injunctive relief for alleged violations of §§ 8(a)(1) and (5) of the Act: (1) to restrain Respondent from engaging in conduct in violation of §§ 8(a)(1) and (5) of the Act; (2) to enter a bargaining order requiring the Respondent to bargain with the Union; (3) to rescind the job redesign program as it affects all unit employees; (4) to restore the terms and conditions of employment for all unit employees; (5) to maintain prior work duties and employee staffing levels of unit employees unless and until Respondent bargains with the Union in good faith; (6) to offer any unit employees laid off or who transferred to non-unit jobs

---

**1.** § 10(j) of the Act provides, in pertinent part:

The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order ... or as it deems just and proper.
29 U.S.C. § 160(j).

under the job redesign program interim reinstatement to their former positions displacing, if necessary, any replacement workers; and (7) to post copies of the District Court opinion and order at Respondent's Louisville facility in all locations where unit employees will see it.

The issue which the Court now decides does not require resolution of the underlying substantive issues. This responsibility lies exclusively with the administrative law judge, the National Labor Relations Board and ultimately the Sixth Circuit Court of Appeals. This Court's role is quite limited. It merely decides whether there exists "reasonable cause" to believe the Respondent committed unfair labor practices and whether interim injunctive relief would be "just and proper." To decide whether the case meets these requirements for injunctive relief is the Court's sole duty.

## I.

The parties have filed the administrative law judge's hearing transcript, exhibits and affidavits with the Court and request a decision based upon them. This chronology describes the underlying dispute.

Petitioner Richard L. Ahearn is the Regional Director of the Ninth Region of the National Labor Relations Board ("Board"), an agency of the United States Government and files a Petition for Injunction, pursuant to § 10(j) of the Act. The Act authorizes the Petitioner in his capacity as a regional director of the Board, to seek injunctive relief from a federal court for an alleged unfair labor practice. Petitioner seeks relief for

alleged violations of §§ 8(a)(1) and (5) of the Act.

Respondent Audubon Regional Medical Center is a corporation engaged in the operation of an acute care hospital in Louisville. It employees approximately 2,000 employees, including approximately 642 registered nurses.[2]

On January 6, 1994, the Nurses Professional Organization, American Federation of State, County and Municipal Employees, AFL–CIO (the "Union") filed a Petition for Election seeking to represent a unit of registered nurses (Case 9–RC–16332). The Union had obtained signed authorization cards dated within one year to the filing of the petition from 347 unit employees designating the Union as their collective bargaining representative. Despite obtaining a card majority, the Union did not demand recognition from the Respondent as the exclusive bargaining representative. Rather, it filed a petition for election.

Soon afterwards, the Union and Respondent entered into a Stipulated Election Agreement which the regional director approved. The agreement defined the pertinent bargaining unit for purposes of the Petition for Election. The unit included all full-time and regular part-time registered nurses, including pool registered nurses employed by Audubon, but excluding all other employees and supervisors as defined by the Act.[3]

On March 3 and 4, 1994, they held the election. Of the 686 eligible voters, 640 ballots were cast. The final tally was 366 to 220 against the Union. The Union challenged fifty-four votes, but, the challenged votes were not sufficient to affect the election's

---

2. During 1993, Respondent underwent several mergers and changes in ownership and is now operated by Columbia/HCA. This merger became effective February 10, 1994. Columbia/HCA currently owns and operates 337 hospitals nationwide and employs approximately 216,000 employees.

3. Respondent claims that the Board has historically ignored Sixth Circuit precedent on the issue of the supervisory status of nurses. *See Beverly California Corp. v. NLRB*, 970 F.2d 1548 (6th Cir.1992). Consequently, rather than litigate the issue of these RNs supervisory status, Respondent chose the quicker and more expedient method to address the issue—stipulating to the unit of employees. However, the Supreme Court's subsequent ruling in *N.L.R.B. v. Health Care & Retirement Corporation of America*, 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994), Respondent claims, settles the issue of the supervisory status of the registered nurses in the Union's bargaining unit. Respondent now claims that notwithstanding its stipulation, the registered nurses are not an appropriate bargaining unit and that, therefore, any relief requested in conjunction with this specific group of employees is not warranted by the Act. Respondent's stipulating to the unit does not affect this Court's analysis of the Petitioner's motion for injunctive relief.

results. On March 11, 1994, the Union filed 40 objections to conduct that it claimed affected the election's results.

Shortly thereafter, the Union filed a charge with the Board alleging Respondent engaged in unfair labor practices within the meaning of §§ 8(a)(1) and (3) of the Act.[4] The Union requested a bargaining order (Case No. 9–CA–31725–1). On May 12, 1994, the Regional Director for the Board issued a Complaint and Notice of Hearing based upon these charges. The complaint alleged that Respondent had interfered with, restrained and coerced employees in the exercise of the rights guaranteed in Section 7 of the Act, a violation of § 8(a)(1).

On May 26, 1994, the Regional Director for the Board sent a letter to the Union concerning the unfair labor practices alleged against Respondent. The Regional Director dismissed, in part, the Union's complaint. Concerning the wage increases and benefits, the Director specifically stated:

> [T]he investigation revealed that the wage increase and other benefits had been proposed and were "in the works" before the petition for an election was filed and, moreover, were granted throughout the Employer's other facilities. Under these circumstances, it was concluded that there were legitimate business reasons for the Employer's actions which would have been taken even absent the pending representation petition. *LRM Packaging*, 308 NLRB 829, No. 22–CA–16415, 1992 WL 236045 (Sept. 16, 1992).

\*　　\*　　\*　　\*　　\*　　\*

Finally, in view of the dismissal of these charges, as well as the size of the unit, it cannot be concluded that a free and fair election would be impossible especially after the imposition of the Board's traditional remedies in the event the Union's objections are meritorious. Under all these circumstances, a bargaining order, pursuant to Section 8(a)(1) and (5) of the Act, as alleged in Case 9–CA–31725–4 is not warranted. *Philips Industries, Inc.*, 295 NLRB 717, No. 22–CA–16415, 1989 WL 224175 (Sept. 16, 1992).

The Union appealed the Board's decision to the General Counsel of the Board in Washington, D.C.

On September 23, 1994, the Regional Director issued a Report on Objections to Elections (Union's charge, dated March 11, 1994). He found that 30 objections raised substantial and material issues and recommended to the Board that a hearing be held before an administrative law judge. He suggested that the representation case be consolidated with an unfair labor practice proceeding. No one objected to the Director's findings.[5]

The Board adopted the Regional Director's Report on the Objections to Election complaint.

On June 1, 1995, General Counsel of the Board partially granted Union's appeal of previous dismissals. This reversal concerned the wage increases and benefits. The General Counsel reversed only one part of the Regional Director's recommendation and stated that a bargaining order may be appropriate. The General Counsel concluded that

> the Employer's announcement and implementation of wage increases and benefits raised issues under Section 8(a)(1) of the Act warranting Board determination based on record testimony developed before an administrative law judge. It was further concluded that the Employer's conduct

---

**4.** The Union alleged that during the election campaign in January through March 1994, Respondent interfered with, restrained and coerced employees in the exercise of their Section 7 rights under the Act. Specifically, Petitioner alleged the following was unlawful conduct committed by Respondent: (1) threats to employees, including but not limited to, loss of wages, benefits and jobs, closure of the hospital, refusal to negotiate; (2) surveillance of employees, or creating the impression thereof; (3) interrogation of employees; (4) increasing wages and benefits, or promise thereof; (5) removal of union literature from bulletin board; (6) solicitation of anti-union sentiments; (7) telling employees organizing is

futile and Respondent would not negotiate with the Union; (8) telling employees that a strike was inevitable, if they vote for the union; and (9) creating a committee to deal with employees' terms and conditions of employment in order to discourage employee's union or protected concerted activities.

**5.** On October 17, 1994, the Union filed an additional unfair labor practices charge alleging Respondent dismissed Joann Sandusky, a registered nurse, because of her union activity (Case No. 9–CA–32276).

raised issues warranting Board determination as to the appropriateness of a remedial bargaining order under *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

Subsequently, the Board consolidated the additional unfair labor practices cases with the *Report on Objections to Elections.* In the complaint, the Board alleges that Respondent has been interfering with, restraining and coercing employees in the exercise of their rights guaranteed by Section 7 of the Act, in violation of § 8(a)(1); discriminating in the hire or tenure or terms or conditions of its employees to discourage union membership in violation of Section 8(a)(1) and (3) of the Act; and failing and refusing to bargain collectively with the exclusive collective bargaining representative of its employees in violation of §§ 8(a)(1) and (5) of the Act.

On September 19, 1995, a hearing on the consolidated cases commenced before Administrative Law Judge (ALJ) John West. The hearing spanned 18 days. On December 8, 1995, the Union requested that the Board seek a 10(j) relief because Respondent began implementing the job reorganization plan of its nursing department. After the ALJ had closed the record of the administrative proceeding, the Union filed a charge with the Board on February 22, 1996, alleging Respondent violated §§ 8(a)(1) and (5) of the Act by redesigning the nursing staffing system without affording the Union an opportunity to bargain. (Case 9–CA–33632).[6]

On March 5, 1996, the Regional Director for the Board issued a Complaint based upon the February 22nd charge alleging Respondent has been failing and refusing to bargain collectively with the collective bargaining representative of its employees in violation of Section 8(a)(1) and (5) of the Act by refusing to bargain with the Union over Respondent's reorganization (Case No. 9–CA–33632).

On March 13, 1996, the Board filed a motion with the ALJ to reopen the record in 9–CA–31725–1, an unfair labor practices claim, and consolidate it with 9–CA–33632, the re-

fusal to bargain claim concerning the job redesign. On March 26, 1996, ALJ West granted the motion; the hearing resumed June 3, 1996.

## II. Legal Standard for § 10(j) relief

Proceedings brought before a district court under § 10(j) of the Act are merely ancillary to unfair labor practice proceedings that pend before an administrative law judge or the Board. *Gottfried v. Frankel*, 818 F.2d 485 (6th Cir.1987). A district court, sitting in a limited role, does not adjudicate the merits of the complaint. Such a role is relegated exclusively to the Board itself, subject to review by an appellate court. *Levine v. C & W. Mining Co.*, 610 F.2d 432, 435 (6th Cir.1979). A primary purpose for a district court's granting injunctive relief under § 10(j) is to maintain the status quo. By doing so, the injunctive relief prevents the nullification or frustration of the Board's remedial authority caused by the passage of time required for the Board to resolve the substance of the labor dispute. Typically, such injunctive relief is sought before the ALJ's or Board's finding a specific entity committed an unfair labor practice; "status quo" refers to the situation which existed before the alleged unfair labor practices took place. *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 30 (6th Cir.1988).

The general rule is that to grant injunctive relief under § 10(j), a district court must make two findings. First, it must find *reasonable cause* exists to believe that the alleged unfair labor practices have occurred. Second, if the requisite reasonable cause is found, a court must then determine whether the prayed for injunctive relief is *just and proper.* A negative answer to either inquiry results in the denial of the petition for injunctive relief. *Id.* at 29.

For obvious reasons, the conclusions of a district court in a Section 10(j) proceeding do not preclude a contrary result by the Board in the unfair labor practices proceeding.

---

6. The charge alleges that "On or about September 21, 1995, without notifying the Nurses Professional Organization, and without affording it an opportunity to bargain, the [Respondent] an-

nounced and subsequently began implementing a redesigned nursing staff system." The redesign became effective January 1996.

The two proceedings simply present different sets of issues to the respective finders of fact.

## A. Reasonable Cause

■ To establish reasonable cause, a petitioner bears a "relatively insubstantial" burden. *Gottfried,* 818 F.2d at 493. The reasonable cause determination is divided into two parts. The first involves a question of law. The district court must decide whether the theory postulated by the petitioner is substantial. The petitioner must produce some evidence in support of the petition. However, he "need not convince the court of the validity of the Board's theory of liability, as long as the theory is substantial and not frivolous." *Kobell v. United Paperworkers Int'l Union,* 965 F.2d 1401, 1407 (6th Cir. 1992) (quoting *Gottfried,* 818 F.2d at 493).

■ The second prong of the reasonable cause determination is a factual determination by the court. It must decide whether the petitioner has set forth facts necessary to satisfy its theory of liability. In addressing this issue, the court is not to resolve the conflicting evidence. The Board need not prove a violation of the Act. Rather, the court is concerned with the substantiality of the theory and whether facts exist to satisfy petitioner's theory. *Id.* Even conflicting facts will not defeat the Board's request.

## B. Just and proper

■ The second step requires a court to determine whether injunctive relief is "just and proper." Granting injunctive relief under this standard is committed to the sound discretion of the court. *Gottfried,* 818 F.2d at 494. This phrase means that interim relief is required to protect the remedial power of the Board pending the completion of its regular procedures. The purpose is to preserve the status quo as it existed before the alleged unfair labor practices occurred. *Calatrello v. "Automatic" Sprinkler Corp. of America,* 55 F.3d 208 (6th Cir.1995). Yet, not only should a court be concerned with protecting the remedial powers of the Board, a court must also query whether return to status quo is possible. *Gottfried,* 818 F.2d at 495.

The Sixth Circuit has defined the "just and proper" standard in the following way:

[T]he district court must determine "that it is in the public interest to grant the injunction, so as to effectuate the policies of the National Labor Relations Act or to fulfill the remedial function of the Board". The district court ... must be careful that the relief granted is not simply functioning as a substitute for the exercise of the Board's power.

*Fleischut,* 859 F.2d at 30 (quoting *Eisenberg v. Lenape Prods., Inc.,* 781 F.2d 999, 1003 (3d Cir.1986)).

A court may consider a party's delay in denying 10(j) relief, especially where the harm has already occurred and the parties cannot be return to status quo. *Gottfried,* 818 F.2d at 495. The *Gottfried* Court noted "'that delay may be considered, but only ... where the delay is of such a character that a final Board order is likely to be as effective as an interlocutory court order.'" *Gottfried,* 818 F.2d at 495 (quoting *Solien v. Merchants Home Delivery Serv., Inc.,* 557 F.2d 622, 627 (8th Cir.1977)).

## III. Alleged violations of § 8(a)(1)

Section 8(a)(1) of the Act states that it is "an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 [Section 7 rights] of this title." 29 U.S.C. § 158(a)(1). Section 7 provides, in pertinent part,

> § 157. **Right of employees as to organization, collective bargaining, etc.** Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection ....

29 U.S.C. § 157. The Supreme Court has held that across the board pay raises and improvements in benefits to discourage employee support of the Union are hallmark violations. *NLRB v. Exchange Parts Co.,* 375 U.S. 405, 409, 84 S.Ct. 457, 459–60, 11 L.Ed.2d 435 (1964). In addition, the Sixth Circuit recognized that an employer may violate the Act when it threatens to close a facility, *Indiana Cal–Pro, Inc. v. NLRB,* 863 F.2d 1292, 1298 (6th Cir.1988), and discrimi-

natorily applies no posting rules is an unfair labor practice, *Union Carbide Corp. v. NLRB*, 714 F.2d 657, 661 (6th Cir.1983) (An employer may violate an employee's rights by interfering with the right to post notices on company bulletin board). *See also Champion International Corporation*, 303 NLRB 102, 1991 WL 135213 (1991).

Additionally, the Board has recognized that threatening loss of jobs and benefits were employees to select union representation also violates the Act, *Somerset Welding & Steel, Inc.*, 304 NLRB 32, 1991 WL 161483 (1991); *General Stencils, Inc.*, 195 NLRB 1109, 1972 WL 4297 (1972). An employer also violates the Act by informing employees it would be futile for them to select a union, *Money Radio, a California Limited Partnership*, 297 NLRB 698, 702, 1990 WL 122286 (1990); unlawfully remedying grievances, *Q–1 Motor*, 308 NLRB 1267, 1992 WL 281689 (1992); announcing a committee to deal with terms and conditions of employment to discourage employees' union activities, *Electromation, Inc.*, 309 NLRB 990, 1992 WL 386692 (1992); unlawfully granting new wage structures violates § 8(a)(1) of the Act. *Camvac International*, 288 NLRB 816, 820, 1988 WL 214102 (1988); and granting pay raises to dissuade union activities. *Q–1 Motor Express, Inc.; see also Color Tech* 286 NLRB 476, 1987 WL 89983 (1987). Without doubt, Petitioner's basic legal theories are substantial.

Moreover, Petitioner has presented the following evidence to prove reasonable cause exists that Respondent engaged in conduct prohibited by § 8(a)(1) of the Act:

(1) Respondent announced a 60–cent–per-hour across-the-board wage increase effective two weeks after the election. No such wage increase had been implemented since 1991. Moreover, the vice-president alleg-

edly queried whether such would be sufficient to defeat the Union.

(2) Respondent increased benefits for part-time employees after the Union filed its petition. Respondent provided these new part-time employees with pro-rated benefits.

(3) Respondent announced the availability of long-term disability insurance plans.

(4) Respondent implemented a committee to deal with staffing problems.

(5) A week before the election, David T. Vandewater, the chief operating officer of the Respondent's owner, toured the facility and allegedly informed members of the bargaining unit that it would not negotiate with the Union and that they should consider themselves on strike.

(6) Supervisors threatened employees that the facility would close or be sold if the unit selected union representation.

(7) Employees were threatened with job loss were the Union successful.

(8) Respondent solicited employee grievances to discourage union activities.

(9) Respondent threatened employees with loss of benefits were the Union to win the election.

(10) Respondent discriminatorily enforced a posting rule by denying the posting of Union literature while permitting the posting of anti-union literature.

 A number of these allegations appear to raise substantial issues of unfair labor practices.[7] Although the Respondent proffers legitimate reasons for its conduct, the Court does not resolve conflicting evidence or the employer's rationale for its actions where Petitioner's evidence supports a substantial legal theory. The Sixth Circuit does, however, permit a district court to rely upon direct and circumstantial evidence to determine the motive of the employer with respect to the challenged conduct. *See NLRB v. Vemco, Inc.*, 989 F.2d 1468, 1477 (6th Cir.1993). For example, the proximity in time between the alleged unfair labor practices and the election provides support of reasonable cause.

---

7. While Petitioner does not seek rescission of certain benefits and wage increases granted to employees, Petitioner does seek injunctive relief prohibiting Respondent from engaging in actions that violate the unit employees' Section 7 rights.

*See JMC Transport, Inc. v. NLRB,* 776 F.2d 612, 620 (6th Cir.1985).

The Court finds that these allegations buttressed by the requisite evidentiary support meet Petitioner's "relatively insubstantial" burden of proving reasonable cause exists to believe that Respondent engaged in unfair labor practices in violation of § 8(a)(1) of the Act.

### IV. § 8(a)(5) Violation

█ Petitioner also argues that reasonable cause exists to believe that Respondent violated both §§ 8(a)(1) and (5) by unilaterally implementing a job redesign program in the registered bargaining unit. Section 8(a)(5) of the Act states that "it shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. 158(a)(5).

The job redesign program began in September of 1995 when Respondent commenced a massive reorganization of its nursing departments. Respondent and a number of affiliate hospitals implemented a "Patient-Focused Care" model to address the care of patients and the fiscal needs of the hospital. Under this new model, Respondent employed a team approach to services provided to patients. This model was supposed to reduce inefficiencies resulting from the older one. The transition was finalized in February 1996 with extensive training for personnel conducted through June of 1996. The reorganization involved changes in staffing levels as well as the physical layout of the hospital. Raising wages, moving of various departments, and hiring new or reassigning existing personnel were some of the changes that occurred. According to Respondent, although some nurses chose to leave after the program's implementation, none were laid off or terminated.

█ It appears that an employer's unilateral change of existing employment conditions may violate § 8(a)(5) but only where the employer company is subject to a duty to bargain with a collective bargaining agent. *Peabody Coal Co. v. NLRB,* 725 F.2d 357, 365 (6th Cir.1984). Before the election was held, the Union never requested Respondent to bargain. Petitioner maintains that Respondent's actions during the election campaign were so egregious as to warrant a bargaining order. Since this bargaining order would be retroactive to the date the Union obtained a card majority, Petitioner argues that Respondent *should* have bargained with the Union concerning the job redesign program. But these are matters not yet settled. On the other hand, Respondent soundly observes that the decision to reorganize was entrepreneurial and does not involve "wages, hours and other terms and conditions of employment." Thus, it was not a subject for bargaining.

The Court need not decide whether or not the program qualifies as a § 8(a)(5) bargaining subject or is entrepreneurial in nature, for Petitioner's basis for arguing a duty to bargain is tenuous at best. Although reorganization may be a bargaining subject, the true issue before the Court is whether Respondent's duty to bargain can arise simply from the prospect that the Board will issue such an order. Petitioner fails to provide the Court with the requisite legal and factual support to show how this *potential* remedy supports the Court's finding an *actual* violation of the duty to bargain, a § 8(a)(5) violation. Without such, the Court cannot make the pertinent finding of reasonable cause.

### V. *Gissel* Bargaining Order

Petitioner believes that the alleged unfair labor practices, which violated § 8(a)(1) of the Act, constitute grounds to set aside the first election and enter a remedial bargaining order pursuant to *NLRB v. Gissel.* It is the cumulative effect of the violations, Petitioner claims, which are sufficiently serious to preclude the holding of a fair rerun election. *See Indiana Cal-Pro, Inc. v. NLRB,* 863 F.2d 1292, 1300 (1980).

Respondent proffers three arguments why this Court should deny Petitioner's request for a bargaining order. First, it argues that the Union failed to obtain the requisite majority status. Second, Respondent argues that the unit of employees for whom the bargaining order is sought is not an appropriate bargaining unit. Third, Petitioner failed to show that a free and uncoerced election could not be held.

The concepts expressed in *Gissel* represent something of a hybrid: in part, a right—the entitlement to be free from the impact of unfair labor practices—and, in part, a remedy—the ability to require an employer to bargain in good faith. This hybrid causes a quandary, the answer to which is none too clear. Is the appropriate analysis a "reasonable cause" determination or one falling under the "just and proper" prong? Some courts routinely discuss the issue under the rubric of the "just and proper" criterion. *See Fleischut*, 859 F.2d at 30. Yet, where a district court must make limited factual determinations, it has done so under the "reasonable cause" criterion. *Hirsch v. Konig*, 895 F.Supp 688 (D.N.J.1995).[8] *See also Hoeber v. KNZ Constn., Inc.*, 879 F.Supp. 451 (E.D.Pa.1995) (In determining the appropriateness of 10(j) relief, the court analyzed the 'supervisory status' of workers in the context of its reasonable cause determination). The Court agrees that discussing the *Gissel* remedy first requires a "reasonable cause" analysis.[9]

■ In *Gissel*, the Supreme Court made it clear that an election is the preferred method for determining the employees' choice of a collective bargaining representative. It also affirmed the Board's authority to issue a bargaining order in cases where an employer has committed pervasive unfair labor practices that may tend to undermine majority strength and impede the election process. The Board must find "that the possibility of erasing the effects of past practices and of insuring a fair election ... by the use of traditional remedies" is slight. 395 U.S. at 613, 89 S.Ct. at 1940. The Sixth Circuit has noted that:

[T]he Board acts within its discretion in issuing a bargaining order, either (1) "in 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices," whether or not the union has established majority status, or, (2) where the union has established majority support, [and] upon

> a lesser showing of employer misconduct ... [i]f the board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order....

*DTR Industries, Inc., v. NLRB*, 39 F.3d 106, 110 (6th Cir.1994) (quoting *Gissel*, 395 U.S. at 613–615, 89 S.Ct. at 1939–41). Petitioner appears to be arguing acts which fall within the second category of violations discussed by the *Gissel* Court. Thus, it must prove (1) that the Union was at some point supported by a majority of the bargaining unit employees; and (2) that the employer's unfair labor practices undermined the union's majority strength and the "possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun election) by the use of traditional remedies, though present, is slight." *Gissel*, 395 U.S. at 614–615, 89 S.Ct. at 1940.

The Sixth Circuit, in defining the requirements for a *Gissel* bargaining order, set forth three requirements which must be met before the Board may issue a bargaining order:

(1) The Union in fact has obtained authorization cards from a majority of employees in an appropriate bargaining unit without misrepresentations or other unfair prac-

---

**8.** In fact, the *Hirsch* Court addresses an issue very similar to one before this Court: viz., are registered nurses "supervisors" under the Act? In that case, Respondent argued that the Supreme Court's ruling in *Health Care*, created "extraordinary circumstances" that preserved its rights to have the bargaining unit reconsidered and warranted its refusal to bargain. The district court recognized the doctrine of "extraordinary circumstances" and did so "in the limited context of determining whether reasonable cause exists as to the occurrence of an unfair labor practice" 895 F.Supp. at 694.

**9.** Even if the Court analyzed the remedy under a "just and proper" standard, virtually all of the same criteria would apply as here. Additional factors, such as Petitioner's delay in seeking the relief, would also counsel against imposing an injunction now. The Court suspects that Petitioner sought injunctive relief now in response to Respondent's job redesign program. The Court has considered this issue separately. See Section V.

tices on its part and has requested bargaining;

(2) The employer has dissipated significantly the Union's majority by the commission of section 8(a)(1) violations; and

(3) A fair election cannot be had under all the circumstances of the particular case.

*M.P.C. Plating, Inc., v. NLRB*, 912 F.2d 883, 888 (6th Cir.1990). The Sixth Circuit described the duty of the Board in making the requisite findings to support a bargaining order:

> [T]he Board cannot depend on conclusory statements, but rather "must make factual findings and must support its conclusions that there is a causal connection between the unfair labor practices and the probability that no fair election could be held."

*DJR Industries, Inc.*, 39 F.3d 112 (quoting *MPC Plating, Inc.*, 912 F.2d at 888). Although the Court does not make the same findings as the Board, these requirements, nevertheless, factor into the Court's reasonable cause determination.

■ Injunctive relief under § 10(j) does not require Board certification of a unit before a duty to bargain arises. Moreover, where a union obtained the requisite majority then lost at a Board-conducted election, injunctive relief remains feasible. *Levine v. C & W Mining Co., Inc.*, 610 F.2d 432 (6th Cir.1979). The Court stated

> [W]hen the Regional Director makes a showing, based on authorization cards, that the union at one point had a clear majority and that the employer then engaged in such egregious and coercive unfair labor practices as to make a fair election virtually impossible, the district court should issue a bargaining order under § 10(j). In such a case the election process has been rendered so meaningless by the employer, that the authorization cards are a clearly superior gauge of employee sentiment. A bargaining order then becomes a just and proper means of restoring the pre-unfair labor practice status quo and preventing further frustration of the purposes of the Act.

*Id.* at 436 (quoting *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir.1975)). But, it also seems appropriate that a district court deny injunctive relief where it is "persuaded that the dispute as to the bargaining unit is substantial." *Kaynard v. Palby*, 625 F.2d 1047, 1055 (2d Cir.1980).

Respondent concedes that a majority of RNs in the proposed bargaining unit signed authorization cards during the one-year preceding the filing of the Petition for Election. The Court does not determine whether the cards were improperly obtained: such a determination would usurp the role of the administrative law judge, the Board and ultimately the Sixth Circuit Court of Appeals. This court need only affirm whether Petitioner provided some evidence to support his claim. Petitioner proffered affidavits and exhibits indicating that a majority of unit employees signed the cards.[10] In the Court's view, the evidence demonstrates reasonable cause.

■ However, Petitioner's evidence of a majority amounts to nothing if a substantial number of the RNs at issue here are 'supervisors' within the meaning of 29 U.S.C. § 164(a). Respondent argues precisely that.

Section 2(3) of the Act excludes from the definition of "employee" any individual employed as a supervisor. Section 2(11) of the Act defines a 'supervisor' in the following manner:

> [A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay-off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). A recent Supreme Court case addressed the issue of whether staff nurses could fall within the parameters of 'supervisors' under the Act. *See NLRB v. Health Care & Retirement Corp. of America,*

---

**10.** The authorization cards stated, in pertinent part, "I hereby authorize the Nurses Professional Organization, UNA, AFSCME, AFL–CIO, to act as my collective bargaining agent for wages, hours and working conditions."

511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994). The Board had traditionally relied upon a three-pronged test in addressing the supervisory status of employees. First, does the employee have the authority to engage in one of section 2(11)'s twelve activities? Second, does the exercise of that authority require the use of independent judgment? Third, does the employee hold the authority in the interest of his/her employer? The issue before the Supreme Court was whether this test, the third prong specifically, was consistent with the Act's definition of 'supervisor.' *Health Care*, 511 U.S. at ——–——, 114 S.Ct. at 1781–85.

The Court noted that the "in the interest of the employer" criterion creates a false dichotomy. *Id.* at ——, 114 S.Ct. at 1782. Acts taken in the interest of the patient cannot be independent of acts taken in the interest of the employer. "The welfare of the patient, after all, is no less the object and concern of the employer than it is of the nurses." *Id.* at ——, 114 S.Ct. at 1783. The Court found that the third prong was inconsistent with the Act. It left undisturbed the remaining criteria used by the Board. Over many years and in this case Petitioner has unfailingly argued that nurses cannot be supervisors under the Act. The Sixth Circuit has been equally faithful in its own position that any individual who meets the statutory tests for supervisor qualifies as such under the Act without exception. *See Health Care & Retirement Corp. v. NLRB*, 987 F.2d 1256, 1260 (6th Cir.1993) *aff'd, Health Care & Retirement Corp. of America v. NLRB*, 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994); *Beverly California Corp. v. NLRB*, 970 F.2d 1548 (6th Cir.1992); *NLRB v. Beacon Light Christian Nursing Home*, 825 F.2d 1076 (6th Cir.1987). Although the dissenters in *Health Care* represented a healthy and cogent minority, none of the Supreme Court's majority language detracts in any way from prior Sixth Circuit precedent as it applies to this case.

Respondent argues that the registered nurses engage in one of the 2(11) activities and exercise independent judgment in furtherance thereof. Specifically, it says that the RNs have the responsibility to direct other employees. Respondent also cites Kentucky law to reenforce its argument. The Kentucky Nursing Practice Act provides that RNs must engage in the "supervision, teaching of, and delegation to other personnel in the performance of activities relating to nursing care." KRS 314.011(6). The Nursing Practice Act provides that LPNs must observe and care for "the ill, injured or infirm under the direction of a registered nurse ..." KRS 314.011(10). Under *Beverly Calif. Corp*, 970 F.2d at 1553, Respondent argues RNs exercise their independent judgment in carrying out their 2(11) duties. This evidence is certainly probative, but it is far from conclusive.

More importantly, Respondent submitted evidence that RNs are primarily responsible for assuring that patient care is properly delivered. They formulate the plan of care and assign tasks to the appropriate personnel. Overseeing the care given patients requires an RN to supervise lesser-skilled employees in the delivery of patient care. Their supervision often extends to new graduates, LPNs and non-licenses nursing staff. When they formulate or revise the care plans, RNs exercise their independent nursing judgment and cannot be delegated to lesser-skilled employees.

The Supreme Court in *Health Care* has certainly not concluded that all nurses are supervisors. That determination requires a thorough factual inquiry, which can only be done by the Board. What other cases have held has much less significance than the evidence of the responsibilities and work which these nurses actually perform. Respondent has presented solid evidence that many of these nurses do exercise independent judgment in the supervision of others and in their care of patients. The judgment they exercise is critical to proper patient care and falls within the definition of 'supervisor' under the Act.

Petitioner asserts his legal theory that nurses cannot be supervisors, but provides few pertinent facts to support this view. Petitioner attempts to minimize rather than completely discount Respondent's evidence. Petitioner makes no serious attempt to question the role nurses play supervising other employees. Rather, he says that defining all these nurses as statutory supervisors results in absurdity because predominantly Respondent's workforce would be supervisors. However, many employees are left to the

supervision of nurses. Certain industries have differing personnel structures; some have few supervisors while others have a majority who supervise. This strikes the Court as the natural consequences of differing staffing patterns and needs among industries, rather than an absurd result.

The Court recognizes the existence of a substantial legal dispute as to the nurses' status as non-supervisors. However, Petitioner has not presented sufficient evidence to seriously challenge Respondent's proof as applied to existing law. Consequently, Petitioner fails to demonstrate a reasonable cause to believe these nurses are non-supervisors.[11]

## VI. Just and Proper

Although the Court has reasonable cause to believe that violations of the Act occurred, it cannot grant any relief unless it is "just and proper" to do so. This determination is within the Court's discretion.

Petitioner argues that injunctive relief is necessary because Respondent's conduct is causing erosion of the Union's support and membership, and that if it continues, any order ultimately issued would be futile. Petitioner also argues that absent recession of job redesign program, the Union would have to bargain back its lawful status quo.

Respondent argues 10(j) relief is not just and proper because Petitioner's inordinate delay in seeking injunctive relief precludes the possibility of returning the work place to the status quo as it existed in 1994. Petitioner concedes this impossibility. Respondent also argues that returning Audubon to the status quo as it existed in September 1995 would impose a substantial organizational burden upon Audubon and disrupt patient care.

The appropriate focus for this Court in addressing whether the relief if "just and proper" is on (1) whether it is necessary to return the parties to status quo pending the Board's proceedings to protect the remedial powers of the Board and (2) whether achieving status quo is possible. *Gottfried*, 818 F.2d at 495. "Status quo" is the state of affairs existing before the alleged unfair labor practices. The status quo after such practices is not deserving of protection. *Fleischut*, 859 F.2d at 30.

First, the Court does not find that the requested affirmative injunctive relief is necessary to preserve the Board's remedial powers. To grant the requested relief at this point would be to substitute the Court's judgment for that of the Board. The job redesign, from which the majority of relief requested stems, was finalized in February 1996. For better or worse, it no longer is a program in transition. It is completed or nearly so. The remedial powers of the Board are certainly broad enough to grant sufficient relief upon conclusion of the administrative proceedings. Moreover, the Court concludes that the appropriate remedies are not substantially less available later than now.

Second, Petitioner's request is unusual in that it attempts to preserve status quo as it existed in September 1995. It is commonly understood that § 10(j) protects the status quo that existed prior to rather than after any alleged unfair labor practice. Here, determining or returning to the status quo may be neither desirable nor precisely possible. This is not a situation where Respondent's alleged actions have affected a select few individuals, the consequences of which the Petitioner wants reversed. Respondent has redesigned the physical layout of its facility, reassigned various individuals within the facility, hired new employees and granted wage and benefit increases to others, all of which affect a wide range of individuals. Although Petitioner merely requests reversal of decisions "as they affect the bargaining unit," Petitioner, in reality, seeks a wholesale cessation and reversal of all redesigns in the facility. To do so would not only hurt Respondent but would also harm numbers of innocent employees. To do so may prevent the company from achieving a legitimate business objective. To do so would impose a premature and unnecessary financial burden

---

11. Because the Court has found insufficient cause to believe that the nurses are non-supervisors, the Court will decline to discuss whether Respondent's actions dissipated the union's majority or whether a free and fair election is still possible.

upon Respondent. Therefore, the Court would be hard pressed to conclude that the affirmative injunctive relief is "just and proper."

The Court does, however, find that a cease and desist order is just and proper under these circumstances. Evidence of a continuing violation is not a necessary prerequisite to issue such an order. Admittedly, the accompanying order is somewhat generic for the very reason that none of the alleged violations are continuing. Nevertheless, issuing this order should reinforce known responsibilities and, thus, help insure that in the event the Board orders a re-run election (as opposed to a *Gissel* bargaining order), this Court's order would have precluded any future anti-union activities by Respondent.

The Court will enter an order consistent with this Memorandum Opinion.

## ORDER

The Court has before it Petitioner's motion for interim injunctive relief pursuant to Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j). The Court having set forth its conclusions in the accompanying Memorandum Opinion and being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Petitioner's claim for interim injunctive relief is DENIED except that Respondent, Audubon Regional Medical Center, shall cease and desist from:

(a) Threatening employees with discipline, job loss, loss of benefits or plant closure or sale if the employees continue to support the Union or select it as their collective-bargaining representative.

(b) Telling employees that their continued support for the Union is futile and that the Respondent will not negotiate with the Union even if a majority of the employees select it as their representative.

(c) Promising and/or granting employees increases in wages and benefits in order to discourage their Union activities.

(d) Establishing employee committees to deal with employee grievances regarding their terms and conditions of employment.

(e) Soliciting grievances from employees and promising to adjust them in order to erode employees' support for the Union.

(f) Discriminatorily enforcing "posting" rules by denying the posting of pro-Union literature while allowing the posting of anti-Union literature.

(g) In any like or related manner interfering with, restraining or coercing its employees in the exercise of their Section 7 rights.

IT IS FURTHER ORDERED that on or before **August 16, 1996,** the parties shall advise the Court of any other unresolved issues or tender an appropriate final order.